UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | Case No. 19-cr-128 (JRT/TNL) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Percy Lee Strother, Jr., | |
| Defendant. | |

---

Bradley M. Endicott, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis MN 55415 (for the Government); and

John S. Hughes, Law Office of John S. Hughes, 331 Second Avenue South, Minneapolis, MN 55401 (for Defendant).

---

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Percy Lee Strother Jr.'s Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment (ECF No. 20), Motion to Suppress Telephone Recordings (ECF No. 21), and Motion to Sever Counts (ECF No. 22). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable John R. Tunheim, Chief District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Defendant is charged via indictment with two counts of felon in possession of a firearm – armed career criminal, in violation of 18 U.S.C. §§ 922(g)(1) and 942(e). (ECF No. 10). Defendant filed a motion seeking suppression of evidence obtained following traffic stops on October 12, 2018 and January 5, 2019, as well as recordings of telephone

1

calls he made while detained at the Hennepin County Jail. He also seeks to sever the trial on the two counts in the indictment. The Government opposes each motion.

A hearing was held on August 1, 2019. (ECF No. 28). The Court heard testimony from the following individuals: Sergeant Robert Topp of the Plymouth Police Department, Officer Miguel Robles of the New Hope Police Department, Officer Marcus Ottney of the Minneapolis Police Department, and Sergeant Seth Augdahl of the Hennepin County Sheriff's Office. The Court received into evidence: Government Exhibit 1 (video of traffic stop); Government Exhibit 2 (photograph of vehicle); Government Exhibit 3 (photograph of vehicle); Government Exhibit 4 (vehicle impounding and towing policy); Government Exhibit 5 (video of traffic stop); Government Exhibit 6 (photograph of vehicle); Government Exhibit 7 (photograph of vehicle); Government Exhibit 8 (photograph of vehicle and handgun); Government Exhibit 9 (jail telephone policy); Government Exhibit 10 (receipt for ADC Inmate Handout); Government Exhibit 11 (photograph of telephone); Government Exhibit 12 (photograph of telephone); Government Exhibit 13 (photograph of telephone); Defendant Exhibit 1 (photograph of vehicle); and Defendant Exhibit 2 (photograph of vehicle). Post-hearing briefing is complete, (ECF Nos. 40, 41, and 43), and the motion is ripe for a determination by the Court. Based upon all the files, records, and proceedings herein, along with the testimony and evidence presented, the undersigned recommends that Defendant's motions be denied.

## I. FINDINGS OF FACT

There are two traffic stops and vehicle searches at issue here. The first stop and search occurred during the early morning hours of October 12, 2018 in south Minneapolis.

(Tr. 59:19-59:22). At approximately 2:54 a.m., Officer Marcus Ottney and his partner observed a vehicle pulling out of a street parking spot with a broken right taillight. (Tr. 59:23-60:8). Officer Ottney ran the license plate number of the vehicle through the NCIC database. (Tr. 60:14-60:24). That database, which contains information regarding warrants and stolen vehicles, indicated the vehicle had been reported stolen from St. Paul. (Tr. 60:25-61:5). Officer Ottney confirmed the description of the vehicle in front of him matched the description of the vehicle reported stolen in the NCIC database. (Tr. 61:14-61:20).

Officer Ottney stopped the vehicle and ordered the driver to throw the keys out the window. (Tr. 62:17-62:21). After multiple requests, the driver complied. (Tr. 62:22-63:7). Officer Ottney and his partner then handcuffed the driver and placed him in the rear of his squad car. (Tr. 63:13-63:16). Officer Ottney identified the driver as Defendant. (Tr. 63:23-63:25). Officer Ottney also reviewed the NCIC report again and confirmed that Defendant was not listed as the registered owner of the vehicle. (Tr. 64:18-64:24). Defendant told the officer, however, that he recently obtained title for the vehicle. (Gov. Ex. 1). Officer Ottney's partner conducted a search of the vehicle and located a handgun between the driver's seat and the center console. (Tr. 65:5-65:12; Gov. Exs. 2-3).

The officers then arranged for the vehicle to be towed to the Minneapolis police impound lot, as required by department policy when there is probable cause to believe a vehicle has been stolen and the owner is not on site. (Tr. 66:2-66:10; Gov. Ex. 4). Department policy also required that an inventory search be conducted of the vehicle before it is towed. (Tr. 66:6-66:16; Tr. 73:14-73:20; Gov. Ex. 4).

3

The second stop and search occurred on January 5, 2019. That evening, Sergeant Robert Topp was assisting with a traffic stop on Bass Lake Road in Plymouth, Minnesota. (Tr. 10:10-10:17). As he returned to his squad care, he observed a vehicle with "very bright" headlights approaching him. (Tr. 10:20-11:3). Sergeant Topp believed the vehicle's headlights were in the high-beam position. (Tr. 11:3-11:4). There was traffic traveling the opposite direction of the vehicle at the time. (Tr. 11:24-12:5).

Sergeant Topp began to follow the vehicle and pulled up in the lane next to it. (Tr. 12:14-12:16). He noticed that a blue light was illuminated on the vehicle's dash, which "confirmed [his] belief that the high beams were activated." (Tr. 12:16-12:19). He initiated a traffic stop. (Tr. 12:19-13:14).

Sergeant Topp approached the driver of the vehicle and identified him as Defendant. (Tr. 13:15-14:7). Sergeant Topp noticed that Defendant "was sweating profusely," despite it being approximately 30 degrees outside. (Tr. 14:11-15:1). Defendant told the sergeant that he was traveling to the Extended Stay hotel nearby, a place the sergeant said was "known for criminal activity." (Tr. 15:7-15:19). Defendant appeared lethargic, was slow to answer questions, and seemed to be "mumbling a bit." (Tr. 15:20-15:25). He also did not make eye contact with Sergeant Topp, who found that to be unusual. (Tr. 16:1-16:8). Sergeant Topp told Defendant that he had been stopped for driving with his high beams activated. (Tr. 16:12-16:16). Defendant turned the high beams off and told the sergeant it was a stupid mistake. (Tr. 16:17-16:22).

Sergeant Topp believed Defendant to be impaired, "[b]ased on his demeanor, the profuse sweating, his lethargic answering, my observations." (Tr. 18:20-18:24). The

4

sergeant also believed that Defendant was in possession of narcotics, based both on his demeanor and the fact that Defendant's vehicle was in "disarray." (Tr. 19:12-19:14). The sergeant noticed that some of the center console panels had been covered with fabric, that a corner of the center console had been pried up, and that the steering wheel center area had been taped up. (Tr. 19:12-19:22). Sergeant Topp believed, based on his previous experience, that narcotics could have been hidden in any of those locations. (Tr. 19:17-19:24).

Sergeant Topp then asked Defendant about his criminal record and employment history. (Tr. 20:3-20:16). Defendant said he was a bouncer and that he had no felony arrests or convictions. (Tr. 20:3-20:24). Sergeant Topp returned to his car and ran a check on Defendant. (Tr. 20:25-21:3). He discovered that Defendant actually "had a pretty significant arrest and conviction record," including multiple felonies. (Tr. 21:16-21:19). The sergeant, concerned that Defendant was lying to him, asked that a K9 narcotics dog respond to his location to conduct a drug sniff. (Tr. 22:10-22:13).

Sergeant Topp returned to the vehicle and asked Defendant to exit. (Tr. 22:14-22:18). The sergeant then performed the horizontal gaze nystagmus test on Defendant. (Tr. 22:25-23:8). The sergeant did not observe nystagmus, which would have suggested Defendant was under the influence of alcohol. (Tr. 23:12-23:18). He did, however, notice that Defendant's pupils were "very constricted," which was "an indicator of narcotic use." (Tr. 23:12-23:18).

Sergeant Topp then asked if Defendant had anything illegal on him. (Tr. 23:23-23:25). Defendant stepped to the back of his car and acted as though he expected to be

searched. (Tr. 24:1-24:5). Sergeant Topp asked permission to search Defendant. (Tr. 24:6-24:9). Defendant agreed. (*Id*.). Sergeant Topp did not locate anything unusual on Defendant. (*Id*.). Sergeant Topp also asked Defendant if he used drugs. (Tr. 24:13-16). Defendant said he most recently used narcotics on or around New Year's Day. (Tr. 24:17-24:23).

The K9 unit arrived approximately 10 minutes after Sergeant Topp radioed for it. (Tr. 25:17-25:21). Officer Miguel Robles and his dog conducted a sniff around Defendant's vehicle. (Tr. 48:14-49:24). The dog alerted to the driver's side door, the passenger-side door, and the passenger side headlight. (Tr. 49:16-50:7; 50:16-50:24; Tr. 51:7-51:17). The dog also showed a change of behavior near the trunk of the vehicle and when he was deployed inside the car. (Tr. 50:9-50:15; 52:22-53:2).

Sergeant Topp detained Defendant and placed him in the back seat of the squad car. (Tr. 27:8-27:15). Officer Robles and Sergeant Topp then conducted a search of the vehicle. (Tr. 27:18-27:21; 53:15-54:2). They eventually located and seized a firearm from behind the passenger headlight area. (Tr. 29:19-29:25; 31:17-31:18; 54:12-55:4; Gov. Exs. 6-8).

Sergeant Topp then placed Defendant under arrest. (Tr. 31:25-32:1). Defendant was transported to the Hennepin County Jail. (Tr. 82:14-82:17). He made multiple phone calls while detained at that jail. (Tr. 82:18-82:20).

With the exception of phone calls to attorneys, all calls at the Hennepin County Jail are monitored and recorded. (Tr. 77:6-77:16). The jail phone system warns inmates their calls may be recorded both before the inmate dials the telephone number and before the call is connected. (Tr. 79:21-80:7). The phone system may provide additional warnings

6

during and after the call, depending on how long the call lasts. (Tr. 80:11-80:18). Sergeant Seth Augdahl, an employee of the Hennepin County Sheriff's Office, reviewed three calls that Defendant made. (Tr. 82:21-82:24). In each call, Defendant received two warnings that his calls were subject to monitoring and recording. (Tr. 82:25-83:2).

In addition to the audio warnings, there are also placards or signs near each jail telephone that indicate calls may be monitored and recorded. (Tr. 80:19-81:2; Gov. Exs 11-13). Furthermore, when detainees are booked, they also have the option of receiving a handout that warns them that phone calls may be recorded. (Ex. 9). At the hearing, the Government introduced a form entitled "Receipt for ADC Inmate Handout." (Ex. 10). The name and booking number at the top right corner of the form indicate it was prepared for Defendant. (*Id*.). At the bottom of the form are lines for two signatures: the inmate's and the staff witness. (*Id*.). Both lines have signatures above them. (*Id*.). There was not, however, any testimony as to who actually signed the form. (Tr. 79:2-79:4).

## II. CONCLUSIONS OF LAW

### A. Motion to Suppress Evidence Obtained Following Traffic Stops

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. An individual asserting Fourth Amendment rights must demonstrate that he or she has a reasonable expectation of privacy in the place to be searched. *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017). If a reasonable expectation of privacy exists, then a warrantless search or seizure is "per se unreasonable under the Fourth

Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted).

### i.   October 2018 Traffic Stop

Defendant first challenges the October 2018 search of his vehicle. The Government argues that Strother does not have standing to challenge the search but that even if he did, police lawfully searched the vehicle under the automobile exception to the warrant requirement; that the search was a valid inventory search; and that the firearm seized as a result of the search would inevitably have been discovered even if the search was otherwise unlawful.

The Court need not decide whether Defendant had standing to challenge the search. Even if he did, the officers were justified in searching the vehicle under the automobile exception to the warrant requirement. Under this exception, "police officers may conduct a warrantless search of a vehicle and containers within the vehicle whenever probable cause exists." *United States v. Sample,* 136 F.3d 562, 564 (8th Cir. 1998) (citing *California v. Acevedo,* 500 U.S. 565, 580 (1991)); *see also United States v. Brown*, 535 F.2d 424, 428 (8th Cir. 1976) (upholding search of vehicle as constitutional under automobile exception because there was probable cause to believe vehicle was stolen). "Probable cause exists where there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016) (citation and internal quotation marks omitted).

Here, when Officer Ottney ran the vehicle license plate through the NCIC database, he discovered it had been reported stolen. He then verified the NCIC report information to

8

make sure the description of the stolen vehicle matched the description of the vehicle in front of him. Upon stopping the vehicle, the officer confirmed that Defendant was not listed as the registered owner of the vehicle in the NCIC report. These circumstances are sufficient to establish probable cause that the vehicle was stolen. *See Brown*, 535 F.2d at 428; *see also United States v. Harris*, 528 F.2d 1327, 1330 (8th Cir. 1975) (noting that NCIC report that vehicle was stolen was sufficient probable cause to justify warrantless search). Thus, the subsequent search of the vehicle was justified under the automobile exception to the warrant requirement.

The fact that Defendant told the officer he had obtained title for the vehicle does not alter the Court's analysis. In determining whether probable cause exists, courts are to apply a common-sense approach that considers all the relevant circumstances. *United States v. Buchanan*, 167 F.3d 1207, 1211 (8th Cir. 1999). Probable cause can also be based on an officer's "independent assessment of conflicting evidence." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016). In this case, Defendant's statements to law enforcement are, when considered with the totality of the other circumstances, insufficient to establish that officers lacked probable cause at the time of the search. *See United States v. Soll*, No. 18-cr-171, 2018 WL 7050676, at *3 (D. Minn. Dec. 13, 2018) (noting that statements that contradict certain parts of the evidence do not defeat probable cause), *report and recommendation adopted by* 2019 WL 235654 (D. Minn. Jan. 16, 2019). The Court

therefore recommends Defendant's motion to suppress evidence from the October 2018 traffic stop be denied.[1]

### ii.      January 2019 Traffic Stop

Defendant also challenges the stop of his vehicle in January 2019. The Government argues the initial stop was lawful because the sergeant had a reasonable suspicion to believe that Defendant was violating Minnesota law regarding the use of high-beam headlights and that Defendant's conduct and the appearance of his car justified expanding the stop for further investigation.

Law enforcement many conduct an investigative traffic stop when they have a reasonable suspicion of criminal activity. *United States v. Tamayo-Baez*, 820 F.3d 308, 312 (8th Cir. 2016). "Reasonable suspicion 'is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause.'" *United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017) (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)). "Reasonable suspicion exists when an officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (citation and internal quotation marks omitted). Though the officer must have more than a "inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification for

---

[1] The fact that Officer Ottney testified at the suppression hearing that his partner was conducting an inventory search vehicle being it was towed does not mean officers lacked probable cause to search the vehicle. Parties may "present alternative arguments whenever sound strategy dictates." *United States v. Castellanos*, 608 F.3d 1010, 1019 (8th Cir. 2010); *see also United States v. Harris*, No. 07-cr-21, 2007 WL 1425481, at *8 (D. Minn. May 11, 2007) (considering alternative arguments advanced by Government).

10

an investigatory stop." *Tomayo-Baez*, 820 F.3d at 312 (citation omitted). "In determining whether reasonable suspicion exists, [the Court] consider[s] the totality of the circumstances in light of the officers' experience and specialized training." *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

The Court will first consider whether the initial stop of the vehicle was unlawful. The parties agree that the only basis the sergeant provided for stopping Defendant was for a violation of Minnesota Statutes Section 169.61. That statute requires that when the driver of a vehicle approaches within 1,000 feet of another vehicle, the driver "use a distribution of light, or composite beam, so aimed that the glaring rays are not projected into the eyes of the oncoming driver." Minn. Stat. § 169.61(b). Defendant argues that the sergeant's testimony is insufficient to establish a reasonable suspicion that Defendant violated this statute. The Court disagrees.

The sergeant observed Defendant driving a vehicle with what the sergeant characterized as "very bright" headlights. (Tr. 11:2-11:3). The sergeant pursued the vehicle and, upon pulling up next to it, observed a blue light on the dashboard, which the sergeant believed was indication the vehicle's high-beam lights were on. During this time, there was vehicle traffic in the opposite direction of Defendant's vehicle. Thus, it was perfectly reasonable for the sergeant to believe Defendant's high-beam lights would impair those drivers. The sergeant was therefore justified in stopping the vehicle.

Defendant argues the Minnesota Court of Appeals decision in *Sarber v. Comm'r of Pub. Safety*, 819 N.W.2d 465 (Minn. App. 2012) dictates a different result. In *Sarber*, a

11

deputy pulled over a vehicle after the driver twice flashed his high beams in quick succession. *Id.* at 467. The flashes were quite brief, lasting "less than a second, maybe a half a second[.]" *Id.* The Minnesota Court of Appeals agreed that the deputy "lacked an objective basis for the stop because briefly flashing one's high beams does not violate the law, absent evidence that the high beams blinded, distracted, or impaired another driver." *Id.* The *Sarber* court explained that the brief flashing of a car's high beams violated Section 169.61 only if done so in manner that "blind[s] or impair[s] other drivers." *Id.* at 471-72.

But the *Sarber* court also made clear that it was not overruling the Minnesota Court of Appeals' decision in a previous case, *Holm v. Comm'r of Pub. Safety*, 416 N.W.2d 473, 474 (Minn. App. 1987). *Id.* There, the Minnesota Court of Appeals held that a driver who has "his bright lights on, and [does] not dim them for oncoming traffic" may be stopped by officers for violating Minnesota Statutes Section 169.69. *Holm*, 416 N.W.2d at 474-75. The *Sarber* court explained that its decision was distinguishable from *Holm* because "in *Holm*, the [driver] failed to dim his high beams at any time," whereas in *Sarber*, the driver only flashed his high beams briefly at another car. 819 N.W.2d at 470.

The circumstances of this case are much more similar to *Holm* than *Sarber*. Here, the sergeant did not observe Defendant briefly flash his high beams. Instead, the sergeant saw Defendant driving with those lights on continuously toward other traffic. Defendant made no attempt to dim his high beams until after the sergeant stopped him. Therefore, under *Holm*, the sergeant was justified in stopping Defendant for violating Minnesota Statutes Section 169.61.

The Court will next consider whether the sergeant was justified in expanding the stop so that law enforcement could conduct a dog sniff of Defendant's vehicle. "After a law enforcement officer initiates a traffic stop, the officer 'may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013) (quoting *United States v. Barragan,* 379 F.3d 524, 528 (8th Cir. 2004)). "These tasks include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning." *Id*. "An officer also may request that the driver sit in the patrol car to answer questions and may ask questions about his itinerary." *Id*. But once the officer has completed those routine tasks, further investigation, including a dog sniff, is unreasonable "unless something that occurred during the traffic stop generated the necessary reasonable suspicion" to justify further investigation or "unless the continued encounter is consensual." *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007) (citation omitted); *see also De La Rosa v. White*, 852 F.3d 740, 743 (8th Cir. 2017).

Here, there are multiple things that occurred during the stop that justified further investigation. First, the sergeant noticed that Defendant exhibited nervous and unusual behavior. Defendant failed to maintain eye contact with the sergeant, was slow to answer questions and appeared lethargic. He was also mumbling and difficult to understand. These factors together contribute to a reasonable suspicion that criminal activity was afoot. *See United States v. Bloomfield,* 40 F.3d 910, 918-19 (8th Cir. 1994) (noting that nervousness and unusual behavior can be suspicious). Defendant also lied to the sergeant when asked

13

about his criminal history. This too could contribute to the sergeant's reasonable suspicion and justify extension of the stop. *United States v. Jones*, 990 F.2d 405, 407-08 (8th Cir. 1993) (determining that deceptive answers, when combined with nervous behavior, could constitute reasonable suspicion). Alone, these circumstances would justify further investigation.

Second, the sergeant also noticed that Defendant's car was in disarray and appeared to have been tampered with. The corner of the center console had been pried up and some center console panels had been covered with fabric. The steering wheel area had also been taped up. The sergeant understood, based on his training and experience, that narcotics were often hidden in each of those areas. The sergeant's belief was reasonable in light of the circumstances. *See United States v. Cook*, 842 F.3d 597, 599 (8th Cir. 2016) (considering case where gun was hidden in center console of the car). The appearance of the vehicle therefore also justified further investigation.

Based on the foregoing, this Court concludes that short expansion of the traffic stop in order for the dog sniff to go forward was permissible under the Fourth Amendment. Once the dog alerted to the presence of contraband in the vehicle, probable cause existed, and a warrantless search of the vehicle was justified under the automobile exception to the Fourth Amendment. *United States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005). The Court therefore recommends that Defendant's motion to suppress evidence from the January 2019 traffic stop be denied.

## B. Motion to Suppress Telephone Recordings

Defendant next argues the recording of telephone calls he made while detained at the Hennepin County Jail violated his Fourth Amendment rights. The Government argues that Defendant consented to the recordings.

Generally, a person has a reasonable expectation of privacy in the contents of a telephone call. *Katz*, 389 U.S. at 353. That expectation vanishes, however, if the person consents to the recording of the call. *United States v. Corona-Chavez*, 328 F.3d 974, 978 (8th Cir. 2003). A prisoner who makes a telephone call after receiving a notice that it will be recorded has consented to the recording. *Id*.

Defendant's argument focuses primarily on the fact that a Government witness could not to identify Defendant's signature on a form regarding the receipt of a jail handbook, which would have informed him that his calls would be recorded. But even setting that issue aside, there is ample other evidence to conclude that Defendant received notice that his calls would be recorded. There were signs above each telephone in the jail informing detainees their calls would be recorded. And Defendant's calls were made on a phone system that informed him twice that the call was subject to recording. These circumstances are sufficient to show Defendant received notice that his calls would be recorded and that, by making the calls, he "impliedly" consented to their recording. *See id*. at 1126 (noting that inmate impliedly consents to monitoring of calls so long as he or she

is aware of jail's monitoring policy). The Court therefore recommends the motion to suppress the telephone recordings be denied. [2]

### C. Motion to Sever

Finally, Defendant moves to sever the two counts against him for trial. When a defendant moves to sever counts, a district court must first determine whether joinder is proper under Federal Rule of Criminal Procedure 8. Under this rule, offenses may be joined if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Though these rules are liberally construed in favor of joinder, *United States v. Darden*, 70 F.3d 1507, 1526 (8th Cir. 1995), the propriety of joinder "must appear on the face of the indictment." *United States v. Bledsoe*, 674 F.2d 647, 655 (8th Cir. 1982) (citations omitted). But even "if joinder is proper, the court still has discretion to order a severance under Federal Rule of Criminal Procedure 14." *Darden*, 70 F.3d at 1526.

Offenses may be joined under the same or similar prong of Rule 8 when they refer to the "same type of offenses occurring over a relatively short period of time, and the evidence as to each count overlaps." *United States v. Shearer,* 606 F.2d 819, 820 (8th Cir. 1979). The Eighth Circuit Court of Appeals has interpreted the "relatively short period of time" requirement to encompass offense" that were committed as far as two years apart. *United States v. Rodgers*, 732 F.2d 625, 629 (8th Cir. 1984). There is, however, "no per se

---

[2] In his motion to suppress (ECF No. 21), Defendant also argued the recording was unlawful under 18 U.S.C. § 2518. He did not brief this issue following the motion hearing. But even if he had, the same analysis would apply. An inmate who places a call after being notified the call might be recorded consents to its intercept under Section 2518. *United States v. Horr*, 963 F.2d 1124, 1126 (8th Cir. 1992). Therefore, to the extent Defendant intended to argue the calls should be suppressed under Section 2518, the Court would nevertheless recommend that motion be denied.

16

rule on when the time period between similar offenses is so great that they may not be joined." *Id*. Instead, the time-period element is to be considered on a case-by-case basis and should be determined "relative to the similarity of the offenses, and the possible overlapping of the evidence." *Id*.

Here, the two offenses are practically identical. In fact, Defendant has simply been charged with multiple violations of the same statute. This is "an unremarkable example of offenses of the 'same or similar character.'" *United States v. Hawkins*, 776 F.3d 200, 209 (4th Cir. 2009) The offenses occurred approximately three months apart, which is well within the time period in which other courts have found felon-in-possession offenses to be "same or similar" under Rule 8(a). *See United States v. Rousseau*, 257 F.3d 925, 931-32 (9th Cir. 2001) (upholding joinder of felon-in-possession offenses that occurred over six months apart); *United States v. Cotton*, No. 17-cr-1908, 2018 WL 4599820, at *3-*4 (S.D. Cal. Sept. 24, 2018) (permitting joinder of two felon-in-possession offenses that occurred approximately two months apart). Furthermore, though not substantial, there is likely to be some overlap in the evidence presented regarding the two offenses. Both offenses would likely require proof of the same underlying felony conviction that made Defendant ineligible to possess a firearm. And, as the Government notes, evidence regarding possession of the firearm in October 2018 may be admissible under Federal Rule of Evidence 404(b) to show a lack of mistake or knowledge regarding Defendant's alleged possession of a firearm in January 2019.[3] *United States v. Walker,* 470 F.3d 1271, 1274

---

[3] That decision would of course be left to the District Judge overseeing the trial in this matter. Should circumstances change, Defendant may be able to renew his motion to sever. *See United States v. Crumley*, 528 F.3d 1053, 1062 (8th Cir. 2008) (explaining when appropriate to renew motion to sever).

17

(8th Cir.2006) ("Evidence that a defendant possessed a firearm on a previous occasion is relevant to show knowledge and intent."); *see also United States v. Harris*, 324 F.3d 602, 607 (8th Cir. 2003) (permitting admission under Federal Rule of Evidence of 404(b) of evidence showing the defendant previously possessed a firearm); *cf. United States v. Brown*, 727 App'x 902, 906-08 (8th Cir. 2018) (upholding admission of prior conviction for unlawful use of firearm to show knowing possession under Section 922(g)(1)). Considering the liberal policy favoring joinder, *see Rimell*, 21 F.3d at 288, the two offenses were properly joined under Rule 8.

Because the two offenses were properly joined, the Court must next determine whether they should be severed under Federal Rule of Criminal Procedure 14. "[T]here is a strong presumption against severing properly joined counts." *United States v. McCarther,* 596 F.3d 438, 442 (8th Cir. 2010). Rule 14 permits the severing of counts only when the joinder of offenses would "appear[] to prejudice a defendant." Fed. R. Crim. P. 14(a); *see United States v. Kind*, 194 F.3d 900, 906 (8th Cir. 1999) (requiring a "clear showing" of prejudice to sever a felon-in-possession in charge). Prejudice "occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that [the defendant] would have had in a severed trial." *United States v. Koskela,* 86 F.3d 122, 126 (8th Cir. 1996). The defendant bears the burden of establishing prejudice. *United States v. Humphreys*, 982 F.2d 254, 259 (8th Cir. 1992).

Defendant has not established that joinder of the two offenses would cause him prejudice. "Where evidence that a defendant had committed one crime would be probative and thus admissible at the defendant's separate trial for another crime, the defendant does

not suffer any additional prejudice if the two crimes are tried together." *United States v. Dennis,* 625 F.2d 782, 802 (8th Cir. 1980); *see United States v. Garrett*, 648 F.3d 618, 626 (8th Cir. 2011) (upholding district court decision denying motion to sever two counts of felon-in-possession of a firearm). As the Court explained previously, evidence of Defendant's possession of firearm in October 2018 may well be admissible to show that he knowingly possessed a firearm in January 2019. *See Garrett*, 648 F.3d at 626. Defendant is unable to show prejudice for this reason alone.

In addition, the fact that Defendant may wish to testify about one offense but not testify about the other is insufficient to show prejudice. To justify a severance under those circumstances, Defendant "must make a persuasive and detailed showing regarding the testimony he would give on the one count he wishes severed and the reason he cannot testify on the other count[]." *United States v. Possick*, 849 F.2d 332, 338 (8th Cir. 1988). Defendant has not made any such showing. He simply contends that "given the facts of the two cases, it may be that [he] wishes to remain silent as to one incident and testify as to the other." (ECF No. 40, p. 14). This is not the type of persuasive and detailed showing that would establish justify severing the counts under Rule 14. *See United States v. McCarther*, 596 F.3d 438, 443 (8th Cir. 2010) (affirming decision to deny motion to sever because the defendant "simply argued to the district court that he wished to testify about Count II, but not the others, and did not disclose his proffered testimony or give reasons why he did not want to testify with regard to the remaining counts"). The Court therefore recommends the motion to sever counts be denied.

## III. RECOMMENDATION

Based upon the foregoing, and all files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment (ECF No. 20) be **DENIED**;

2. Defendant's Motion to Suppress Telephone Recordings (ECF No. 21) be **DENIED**; and

3. Defendant's Motion to Sever Counts (ECF No. 22) be **DENIED**.

Date: October 31, 2019

*s/ Tony N. Leung*
Tony N. Leung
United States Magistrate Judge
District of Minnesota

*United States v. Strother, Jr.*
Case No. 19-cr-128 (JRT/TNL)

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.