**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> PERCY LEE STROTHER, JR., <br><br> Defendant. | Criminal No. 19-128 (JRT/TNL) <br><br> **MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE** |

Bradley M. Endicott, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 316 North Robert Street, 404 U.S. Courthouse, Saint Paul, MN 55101, for plaintiff.

John S. Hughes, **LAW OFFICE OF JOHN S. HUGHES**, 331 Second Avenue South, Suite 705, Minneapolis, Minnesota 55401, for defendant.

Defendant Percy Lee Strother, Jr. ("Strother") was charged with two counts of felon in possession of a firearm – armed career criminal, in violation of 18 U.S.C. §§ 922(g)(1) and 942(e). On June 6, 2019, Strother filed three motions which, by rule, were referred to the Magistrate Judge: (1) Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment; (2) Motion to Suppress Telephone Recordings; and (3) Motion to Sever Counts.

On October 31, 2019, United States Magistrate Judge Tony N. Leung issued a report and recommendation ("R&R") recommending that the Court deny Strother's Motions.

Strother filed timely objections to portions of the R&R.[1] After de novo review of the issues, the Court will overrule Strother's objections, adopt the R&R, and deny Strother's Motions.

## BACKGROUND[2]

The United States charged Strother with two counts of being a felon in possession – armed career criminal. (Indictment at 1–2, May 7, 2019, Docket No 10.) The firearms at issue in this case were found by police during two searches that resulted from traffic stops involving Strother on October 12, 2019 and January 5, 2019. Strother moved to suppress the evidence from both stops, alleging that the evidence was obtained in violation of his Fourth Amendment right to be free of unreasonable searches and seizures.

### A.    October 12, 2018 Traffic Stop

In the early morning hours of October 12, 2019, Officer Marcus Ottney ("Ottney") of the Minneapolis Police Department ("MPD") observed a vehicle with a broken taillight pull out of an on-street parking space and drive away. Ottney ran the license plate of the

---

[1] Strother also objects to what he characterizes as a mistake by the Magistrate Judge in reciting the evidence received at the hearing on his motions. (Objections at 1–2.) Because the issue of whether the exhibit attached to Strother's reply memorandum to the Magistrate Judge constitutes part of "the record" is immaterial to this order, the Court will decline to consider it.

[2] Strother has not objected to the Magistrate Judge's factual findings. Therefore, the Court adopts the facts as stated by the Magistrate Judge and summarized here. The Court only summarizes the facts necessary to address Strother's objections. Additional facts are available in the R&R.

vehicle through the National Criminal Information Center ("NCIC") database.[3] The database indicated that the vehicle had been reported stolen in Saint Paul.

After confirming that the vehicle that he saw matched the one in the NCIC database, Ottney stopped the vehicle and ordered the driver to throw the keys out of the window. The driver did not initially comply and Ottney had to repeat the order several times. Eventually, the driver followed the order. With the assistance of his partner, Ottney then handcuffed the driver and put him in the back seat of his MPD squad car. Ottney identified the driver as Strother and concluded from the NCIC database that Strother was not the registered owner of the vehicle. Strother told Ottney that he had recently obtained title to the vehicle. While Ottney was in the squad car with Strother, his partner searched the vehicle and found a handgun between the driver's seat and the center console.

### B. January 5, 2019 Traffic Stop

In the evening of January 5, 2019, Sergeant Robert Topp ("Topp") of the Plymouth Police Department ("PPD") observed a vehicle with "very bright" headlights approaching as he was assisting with a traffic stop. Topp believed the vehicle was driving with its high-beam headlights engaged, and also saw other vehicles driving in the opposite direction. Topp got into his squad car and pulled up next to the vehicle. He saw a blue light

---

[3] The NCIC database is "an electronic clearinghouse of crime data" that helps police "apprehend fugitives, locate missing persons, [and] recover stolen property . . . ." *National Crime Information Center (NCIC)*, FBI, https://www.fbi.gov/services/cjis/ncic.

illuminated on the dash, which further confirmed his belief that the vehicle was being driven with its high beams engaged.

Topp pulled the vehicle over and told the driver, who Topp identified as Strother, that he had been pulled over for driving with his high beams on. Strother turned the high beams off and told Topp it was a stupid mistake. Topp noticed that Strother was sweating profusely, which he found unusual given the winter temperature. Strother also told Topp that he was driving to a nearby Extended Stay hotel, which was, according to Topp, known for criminal activity. Topp felt that Strother was behaving strangely: he avoided eye contact with Topp, was slow to answer questions, mumbled his answers, and appeared lethargic. Finally, Topp saw that the vehicle was in what he called "disarray"; center-console panels had been covered with fabric, a portion of the center console had been pried up, and the steering-wheel area had been taped.

Based on these observations, Topp believed Strother was under the influence and in possession of narcotics. He asked Strother about his criminal record, and Strother replied that he had no felony arrests or convictions. Topp returned to his squad car and ran a check on Strother. The database report contradicted Strother, showing multiple felony convictions. Based on Strother's apparent deceptive answers, Topp radioed for a narcotics canine unit to respond to the stop to conduct a drug sniff.

Topp returned to the vehicle and ordered Strother to get out. He then performed a horizontal-gaze nystagmus test on Strother, to investigate whether Strother was under the influence of alcohol. Although Todd did not see nystagmus, he did notice that Strother's

pupils were very constricted, which suggests potential narcotics use. Todd then asked Strother whether he had anything illegal on him and asked for permission to search him. Strother consented to the search, and Todd did not find any illegal items. Todd asked Strother whether he used drugs, and Strother said that he had most recently used drugs four days earlier, on New Year's Day.

Officer Miguel Robles ("Robles") of the New Hope Police Department then arrived to conduct the canine sniff. Robles' dog alerted at the driver-side door, the passenger-side door, and the passenger-side headlight. Topp and Robles then searched the car and found a handgun while searching the passenger-side headlight area.

### C. Jail Phone Calls

After Topp and Robles found the firearm, Topp placed Strother under arrest. While subsequently jailed at the Hennepin County Jail ("HCJ"), Strother made multiple telephone calls. All calls made from HCJ, other than calls to attorneys, are monitored and recorded. Persons making calls from HCJ are told their calls are recorded before dialing the number and before the call is connected; additional notification may be given depending on the length of the call. There are also call-recording notification signs posted near the HCJ telephones. Finally, when a person is booked into HCJ, they are given a form either acknowledging the receipt or waiver of a call-notification handout.

Sergeant Seth Augdahl of the Hennepin County Sheriff's Office reviewed three calls made by Strother. In each, Strother received two warnings that his calls were being monitored and recorded. Additionally, the United States provided a form waiving receipt

of the call-notification handout. The form included signatures above the lines for inmate and staff witness, but there was no testimony as to who actually signed the form.

## DISCUSSION

### I. STANDARD OF REVIEW

After an R&R is filed by a magistrate judge, "a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2). For a dispositive matter such as a motion to suppress evidence, "[t]he district judge must consider de novo any objection to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(1), (3); *see also* 28 U.S.C. § 636(b)(1). "The objections should specify the portions of the magistrate judge's [R&R] to which objections are made and provide a basis for those objections." *Nayer v. Walvatne*, No. 07-1958, 2009 WL 4527774, at *2 (D. Minn. Sept. 28, 2008).

### II. MOTION TO SUPPRESS TRAFFIC-STOP EVIDENCE

Strother objects to the recommendation that the Court deny his Motion to Suppress in the case of both traffic stops. He argues the first search violates the Fourth Amendment because it was not supported by probable cause; he argues the second search was unlawful at the outset because Todd lacked reasonable suspicion to initiate the stop and, even if the stop was lawful, that Todd unlawfully extended the stop to execute a dog sniff.

#### A. October 12, 2018 Stop

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.

Const. amend. IV. Generally, a warrantless search is per se unreasonable. *See, e.g.*, *Maryland v. Dyson,* 527 U.S. 465, 466 (1999) (noting a warrant is generally required under the Fourth Amendment).

For nearly a century, the Supreme Court has recognized an exception to the warrant requirement when police search an automobile. *See Carroll v. United States*, 267 U.S. 132, 153 (1925). This exception was grounded in the "the practical challenges of obtaining a warrant for a vehicle that could be 'quickly moved' out of the jurisdiction." *United States v. Blaylock*, 535 F.3d 922, 926 (8th Cir. 2008) (quoting *Carroll*, 267 U.S. at 153). The Court has subsequently "identified an additional justification for the exception: 'the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.'" *Id.* (quoting *South Dakota v. Opperman,* 428 U.S. 364, 367 (1976)). Therefore, "the automobile exception 'justif[ies] searches without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met.'" *Id.* (quoting *California v. Carney,* 471 U.S. 386, 392 (1985)); *see also United States v. Sample*, 136 F.3d 562, 564 (8th Cir. 1998) (stating that "police officers may conduct a warrantless search of a vehicle . . . whenever probable cause exists").

Probable cause exists "where there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Schleford*, 830 F.3d 751, 753 (8th Cir. 2016) (cleaned up). Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Rather, it is "a fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). It "requires only a probability or substantial chance of criminal activity, not an actual

showing of such activity." *Id.* at 243–44, n.13. The Eighth Circuit has held that where police have probable cause to believe a car is stolen, they may conduct a "full" warrantless search of the car. *United States v. Brown*, 535 F.2d 424, 428 (8th Cir. 1976); *see also United States v. Hines*, 564 F.2d 925, 927–28 (10th Cir. 1977) (noting that NCIC information "has been routinely accepted" to establish probable cause for arrest, and therefore it can also serve as "corroborative evidence of a vehicle theft").

The Magistrate Judge concluded that the search of the vehicle following the October 12, 2018 traffic stop was permissible under the automobile exception. Strother objects, arguing that although a NCIC report that a vehicle is stolen may provide probable cause for a search, Strother told officers he had recently purchased the vehicle.[4] Strother appears to therefore argue that because Ottney and his partner had evidence that conflicted with NCIC—namely the word of Strother—the search was unreasonable. Strother does not offer any authority in support of this argument.

The Court disagrees. After running the license-plate number of the vehicle in the NCIC database and receiving a report that the car had been reported stolen, Ottney verified that the information in the report regarding the vehicle's make, model, and color matched the vehicle in front of him. *See Maresca v. Bernalillo County*, 804 F.3d 1301, 1311 (10th

---

[4] Strother also objects that the Magistrate Judge did not take up the United States' alternative arguments that (a) Strother had no standing to object to the October 12, 2018 search in the first instance; and (b) the search was permissible. Because the Court agrees with the Magistrate Judge that it is not necessary to decide these issues, the Court will overrule this objection.

Cir. 2015) (concluding that police violated the Fourth Amendment when they failed to confirm that the model, make, and color from the NCIC report matched the vehicle in front of them, after receiving an incorrect report from the NCIC database based on an officer's typo). Ottney also confirmed Strother was not the registered owner. Weighed against all this supporting evidence, Strother's statements that he had recently purchased the vehicle are insufficient to render unreasonable Ottney's belief that the vehicle was stolen.

Because the police had probable cause to believe the vehicle was stolen, the subsequent warrantless search of the vehicle does not offend the Fourth Amendment. The Court will therefore deny Strother's objection and deny his Motion to Suppress the handgun discovered during the October 12 search.

### B. January 5, 2019 Stop
#### 1. The Initial Stop

"The Fourth Amendment permits investigative traffic stops when law enforcement has reasonable suspicion of criminal activity." *United States v. Lopez-Tubac*, 943 F.3d 1156, 1159 (8th Cir. 2019) (quoting *United States v. Tamayo-Baez*, 820 F.3d 308, 312 (8th Cir. 2016)). "Reasonable suspicion exists when an officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Id.* (quoting *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014)). Courts assess whether police had reasonable suspicion using a totality-of-the-circumstances test. *Id.*

Minnesota law requires that that "[w]hen the driver of a vehicle approaches a vehicle within 1,000 feet, such driver shall use a distribution of light, or composite beam, so aimed that the glaring rays are not projected into the eyes of the oncoming driver." Minn. Stat. § 169.61(b). Put another way, the statute requires drivers to dim their high beams when encountering oncoming traffic. Failure to comply with Minn. Stat. § 169.61(b) is a misdemeanor. *Id.* § 169.47, subd. 1(a).

The Magistrate Judge concluded that the that the initial stop was lawful because Todd observed Strother violate section 169.61(b). Strother objects that this decision conflicts with the decision of the Minnesota Court of Appeals in *Sarber v. Commissioner of Public Safety*, 819 N.W. 2d 465 (Minn. Ct. App. 2012).

In *Sarber*, the Court of Appeals reversed the decision of the Commissioner of Public Safety to revoke Sarber's driver's license and impound his license plates. The police based the initial traffic stop that lead to the discovery of his intoxication on Sarber twice flashing his high beams at a patrol car while traveling in the opposite direction. *Id.* at 467. The Court of Appeals determined that the statutory term "glaring" meant that high-beam flashes did not violate section 169.61(b) "unless another driver was at least temporarily blinded or impaired by the lights." *Id.* at 468. Therefore, because "the deputy did not testify that the high beams blinded, distracted, or otherwise impaired him," there was not evidence Sarber had violated the statute. *Id.* at 472.

Strother argues that because Todd did not testify that his high beams "blinded, distracted, or otherwise impaired him," Todd lacked a lawful basis to initiate the stop. This

argument, however, ignores *Sarber*'s discussion of *Holm v. Commissioner of Public Safety*, 416 N.W.2d 473 (Minn. Ct. App.1987). In *Holm*, the Court of Appeals held that "officers were justified in stopping [a] vehicle for failure to dim its lights when oncoming traffic was approaching." *Id.* at 475. In *Sarber*, the Court of Appeals noted that the decision in *Holm* was distinguishable from *Sarber* because Holm had "failed to dim his high beams **at any time**. The court therefore did not need to address whether the 'glaring' requirement was satisfied." *Sarber*, 819 N.W. at 470 (emphasis added).

The combination of Todd noticing Strother's very bright headlights, pulling up next to Strother to see the blue light on his dash, and observing Strother failing to dim his lights for oncoming traffic provided reasonable suspicion that Strother was violating Minn. Stat. § 169.61(b). Therefore, the traffic stop was lawful.

### 2. Canine Sniff

The Supreme Court has analogized a traffic stop to a *Terry* stop.[5] *See, e.g.*, *Rodreguez v. United States*, 575 U.S. 348, 354 (2015). In a *Terry* stop, a police officer "who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'"

---

[5] So named after the case in which the Supreme Court first articulated this exception to the warrant requirement, *Terry v. Ohio*, 392 U.S. 1 (1968).

*Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)).

"Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (cleaned up). Therefore, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The "ordinary inquiries incident to such a stop," *id.* at 408, "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. In the absence of a reasonable suspicion of a crime other than the initial traffic violation, the officer cannot artificially extend the stop.

However, "[a]n officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017), *cert. denied*, 138 S.Ct. 245 (2017) (quoting *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002)). Reasonable suspicion requires that "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" investigation. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable

suspicion is a less demanding standard than probable cause, but it must be more than a hunch. *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010).

Without unjustifiably extending the initial traffic stop, Todd developed a reasonable suspicion of criminal activity warranting further investigation. Strother was sweating profusely; he avoided eye contact with Topp; was slow to answer questions; mumbled his answers; and appeared lethargic. This suspicious behavior, in combination with the disarray of the vehicle's interior and Todd's knowledge that Strother's destination, the Extended Stay hotel, was a location known for criminal activity provided reasonable suspicion of a crime other than the traffic stop—namely, possession or being under the influence of narcotics. *See, e.g.*, *United States v. Riley*, 684 F.3d 758, 763–64 (8th Cir. 2012) (noting that suspicious behavior alone may not be sufficient to establish reasonable suspicion, but when combined with other factors it may provide the basis for investigation); *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994) (noting that, although there is "a possible innocent explanation for each of the factors . . . if examined separately, as a totality they were sufficient to create a reasonable suspicion").

This suspicion was strengthened by Strother's deceptive answer about his criminal history—deception which Todd was almost certain to discover when doing an outstanding warrant check on Strother, which has been described as part of the "mission" of a traffic stop. *Cf. Rodriguez*, 575 U.S. at 355. As soon as Todd discovered Strother's misrepresentation of his criminal history, after already observing the other suspicious factors mentioned above, he radioed for a canine unit. He did so with reasonable suspicion.

*See United States v. Pantazis*, 816 F.2d 361, 363 (8th Cir. 1987) ("Pantazis' deceptive answers coupled with his previous suspicious actions solidified the objective basis required for Officer Giller's belief the shoulderbag contained narcotics."). Todd then returned to the vehicle and continued to investigate his narcotics suspicion by conducting the horizontal-gaze nystagmus test and the (consensual) search of Strother's person. Just after Todd and Strother were discussing Strother's recent narcotics use—again, a factor supporting reasonable suspicion—Robles arrived with his dog.

Strother argues that Todd's actions run afoul of the holding in *Rodriguez*. In that case, the Supreme Court concluded that an officer had impermissibly extended a traffic stop in order to conduct a drug sniff. *Rodriguez*, 575 U.S. at 357. So too did Todd, says Strother. This argument caries *Rodriguez* beyond its narrow holding, however. There, the officer had completed the initial traffic stop, explained the warning to the people in the car, and returned their documents—put simply, the officer had "[taken] care of all the business." *Id.* at 352. Yet he did not consider the car "free to leave." *Id.* He then held the defendants for six or seven minutes until the dog arrived. *Id.* Because the Eighth Circuit had not addressed the finding of the court below that there was no reasonable suspicion beyond the traffic violation, the Supreme Court concluded the officer had impermissibly extended the seizure. *Id.* at 357–58.

Here, there is ample evidence of reasonable suspicion of criminal activity independent of the initial traffic violation. The Court in *Rodriguez* anticipated such a scenario could be possible. *Id.* at 358 ("The question whether reasonable suspicion of

criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation, therefore, remains open for Eighth Circuit consideration on remand."). Although approximately ten minutes had passed between Todd's request for a canine unit and Robles arrival, Todd was actively conducting his lawful investigation. *Cf. Murillo-Salgado*, 854 F.3d at 415–16 (finding permissible a twenty-three-minute-long traffic stop).

Because Todd had reasonable suspicion of criminal activity, his course of conduct does not violate the narrow rule found in *Rodriguez*. The dog sniff was therefore permissible. The Court will therefore deny his Motion to Suppress.[6]

## III. MOTION TO SUPPRESS JAIL CALLS

Strother objects to the recommendation that the Court deny his Motion to Suppress recordings of telephone calls he made from HCJ.

People have a reasonable expectation of privacy in the contents of a telephone call, *Katz v. United States*, 389 U.S. 347, 353 (1967), and therefore recordings of calls made without a warrant may be suppressed. *See, e.g.*, 18 U.S.C. § 2518(10)(a) (allowing for the suppression of unlawfully intercepted wire or oral communications). However, telephone calls "may be intercepted without a warrant if one of the parties to the call gives 'prior

---

[6] In his memorandum, Strother states that he objects to the R&R's conclusion that "the stop, the extension of the stop, and the search of the vehicle were lawful." (Objections at 5.) However, he only provides argument that the initial stop and dog sniff were unlawful. (*See id.* at 6–9.) After the dog alerted, Todd and Roble had probable cause to search the vehicle under the automobile exception to the Fourth Amendment. To the extent Strother validly objected to this conclusion, the Court will overrule the objection.

consent.'" *United Sates v. Lucas*, 499 F.3d 769, 780 (8th Cir. 2007) (quoting 18 U.S.C. § 2511(2)(c)).

In *Lucas*, the Eighth Circuit concluded that the combination of a handbook outlining call recording procedures, posted placards, and an audio message before the call meant that the defendant had given prior consent to the recording of his calls. *Id.* Strother's case is no different. The absence of testimony that the signature on his call-policy waiver sheet was Strother's is insufficient to outweigh the impact of the placards and two recordings played on each call Strother made. He had knowledge that calls made from HCJ were subject to monitoring and recording, and therefore consented within the meaning of § 2511(2)(c). The Court will therefore deny Strother's Motion to Suppress.

## IV. MOTION TO SEVER COUNTS

Strother objects to the recommendation that the Court deny his Motion to Sever Counts, on the basis that he will be unfairly prejudiced.

A person may be charged in a single indictment with multiple offenses if those offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). The Eighth Circuit has held that offenses "are of the same or similar character" when they the "same type of offenses occurring over a relatively short period of time, and the evidence to each out overlaps." *United States v. Shearer*, 606 F.2d 819, 820 (8th Cir. 1979).

Here, the alleged offenses are nearly identical, and occurred within several months. Evidence of Strother's status as a felon will be presented in each. Strother is unable to demonstrate the "clear showing of prejudice" the Eighth Circuit has said is necessary to sever felon-in-possession counts. *United States v. Rock*, 282 F.3d 548, 552 (8th Cir. 2002); Fed. R. Crim. P. 14(a). Strother's generalized statement that he may wish to testify as to one offense but not to the other does not meet the "persuasive and detailed showing regarding the testimony he would give on the one count he wishes severed and the reason he cannot testify on the other . . . ." *United States v. Possick*, 849 F.2d 332, 338 (8th Cir. 1988). Because Strother has failed to clearly show prejudice, the Court will deny his Motion to Sever.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Objections to the Report and Recommendation [Docket No. 48] are **OVERRULED**;

2. The Report & Recommendation [Docket No. 46] is **ADOPTED**;

3. Defendant's Motion to Suppress Evidence in Violation of the Fourth Amendment [Docket No. 20] is **DENIED**;

4. Defendant's Motion to Suppress Telephone Recordings [Docket No. 21] is **DENIED**; and

5. Defendant's Motion to Sever Counts [Docket No. 22] is **DENIED**.

DATED: January 13, 2020　　　　　　　　_____/s/ John R. Tunheim_____
at Minneapolis, Minnesota.　　　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　　　　　　Chief Judge
　　　　　　　　　　　　　　　　　　　　　　United States District Court